**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| **TAVION CARTER** | * |
| **10214 Prince Place** | * |
| **Largo, Maryland 20774** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| **vs.** | * |
| | * |
| **BOWIE STATE UNIVERSITY** | * |
| **14000 Jericho Park Road** | * |
| **Bowie, MD 20715-9465** | * |
| | *           **Docket No.** |
| **and** | * |
| | * |
| **DR. AMINTA HAWKINS BREAUX** | * |
| **President of Bowie State University** | * |
| **14000 Jericho Park Road** | * |
| **Bowie, MD 20715-9465** | * |
| | * |
| **and** | * |
| | * |
| **DR. ARTIE TRAVIS** | * |
| **Former Vice President for Student Affairs** | * |
| **Bowie State University** | * |
| **14000 Jericho Park Road** | * |
| **Bowie, MD 20715-9465** | * |
| | * |
| **and** | * |
| | * |
| **FORMER CHANCELLOR** | * |
| **DR. ROBERT CARET** | * |
| **University System Of Maryland** | * |
| **701 E. Pratt St.** | * |
| **Baltimore, MD 21202** | * |
| | * |
| **and** | * |
| | * |
| **Other unknown employees and officials** | * |
| **at Bowie State University and** | * |
| **the University System Of Maryland** | * |
| | * |
| **and** | * |
| | * |

1

**The State of Maryland**                    *
                                             *
                                             *
                    **Defendants.**          *

---

## COMPLAINT

COMES NOW the Plaintiff, Tavion Carter, by and through his attorney, and sues the Defendants, Bowie State University, Dr. Aminta Hawkins Breaux, Dr. Artie Travis, the University System of Maryland, former Chancellor Dr. Robert Caret, and other unknown employees and officials at Bowie State University and the University System of Maryland, and avers and alleges that the Defendants have discriminated against him on the basis of his sex and sexual orientation, and discriminated against him due to his disability, and retaliated against him for his exercise of constitutionally protected behavior in violation of federal law and the laws of the State of Maryland,  and have also committed intentional torts against him and violated their contract with him in violation of common law and the laws of the State of Maryland, causing him to experience injury and damages, including mental and emotional distress.  Plaintiff further avers and alleges the following:

## PARTIES

1.      Plaintiff Tavion Carter is an African American Black male (BM) who was a resident of Prince George's County, Maryland in September of 2017, and who is currently a resident of Prince George's County Maryland.   As explained below, Mr. Carter has been injured and risks further harm as a result of the Defendants' illegal acts and omissions.

2.      At all times relevant hereto, Defendant Bowie State University (BSU) is and was a public historically black university which receives Federal funding in Prince George's County,

2

Maryland, United States, and a part of the University System of Maryland and doing business as Bowie State University.

3.      At all times relevant hereto, Defendant Dr. Aminta Hawkins Breaux was and is President of Bowie State University.  She is sued in her official capacity.

4.      At all times relevant hereto, Defendant Dr. Artie Travis was Vice President for Student Affairs at Bowie State University.  He is sued in his personal and official capacity.

5.      At all times relevant hereto, Defendant University System of Maryland (USM) is a public higher education system which receives Federal funding in the State of Maryland, United States. It comprises twelve universities  including Bowie State University as well as three regional higher education centers located throughout the state of Maryland and is doing business as University System of Maryland (USM).

6.      At all times relevant hereto, Defendant Dr. Robert Caret was Chancellor of the University System of Maryland.  He is sued in his official capacity.

7.      All Defendants are employed by and or agents for the State of Maryland, who is liable for their actions under the theory of Respondeat Superior.


## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court as this is an action for violation of the Plaintiff's civil and constitutional rights by the Defendants under 20 U.S.C. Section 1681 *et seq.* (Title IX, Education Amendments of 1972 ) and 42 U.S.C § 12101, *et seq.* (The Americans with Disabilities Act) as well as other torts and common law violations.

9.      Due to the federal questions involved in the consideration of the Plaintiff's claims under the above-stated laws, this Court has subject matter jurisdiction under 28 U.S.C. §1331.

10.    This Court has supplemental jurisdiction over Mr. Carter's state law claims pursuant to 28 U.S.C. §1367 because his state law claims are related to his federal claims and form part of the same case and controversy.

11.    This Court has personal jurisdiction over Bowie State University and the University System of Maryland because they are educational institutions who receive Federal funds and are located and doing business in the State of Maryland.  This Court has personal jurisdiction over President Hawkins Breaux, Dr. Travis, Former Chancellor Dr. Caret, and unknown Bowie State and University System of Maryland employees and officials because upon information and belief, they work and or  reside in the State of Maryland.

12.    Venue is appropriate to this Court because all parties reside, work, and or are located in the State of Maryland, and the events giving rise to Mr. Carter's claims occurred in Maryland.   Additionally, the tortious acts and omissions and violations of common law occurred in Maryland and injured Mr. Carter there as well.

## FACTS

13.    The averments of fact stated in all preceding paragraphs are adopted herein and made a part hereof as if fully set forth herein.

14.    Plaintiff Tavion Carter has been on his own since age 17.  He dreamed of going to college and playing football there, but because of various obstacles in his personal life, he was afraid that he would never get there.  He never met his father, and moved to Maryland from Las Vegas, Nevada at age 20 after his mother went to prison and he was homeless.

15.     Despite having moved to Maryland to live with other family members, Mr. Carter soon found himself homeless again, and moved into a shelter in the District of Columbia. It was around this time that he began to act on his true sexual orientation and live his life as a

Gay male.  He never gave up on his dream to pursue a college education however, and he was

subsequently accepted and matriculated into Bowie State University at the age of 22 years old.

16.    Initially Mr. Carter tried to commute from the homeless shelter in the District of

Columbia to Bowie State University.  However, since he did not have a car or any other form of

consistent and reliable transportation, his efforts to commute were fraught with problems.

Additionally, his living situation became increasingly unstable and precarious, and he found that

as a young homosexual male he was threatened with and subjected to sexual molestation at the

homeless shelter where he lived.  These factors combined to make it extremely difficult for him

to get to school on a reliable and consistent basis, and to concentrate and focus when he arrived

on campus and or tried to do his schoolwork and participate in student activities.

17.    Mr. Carter went to Dr. Travis, who was then the Vice President for Student

Affairs at Bowie State University. He explained his precarious situation to Dr. Travis, and asked

for help.  Dr. Travis was able to arrange and help Mr. Carter get emergency housing at Christa

McAuliffe Residential Community (CMRC)—one of the University's on-campus housing

facilities.

18.    After moving into the University housing Mr. Carter met and began his first

serious romantic physical relationship with another male student who lived in CMRC.  They kept

the existence of their relationship private due to the stigma attached to being an openly

homosexual male on the campus of Bowie State University.  Mr. Carter fell in love with this

student, and believed that his feelings were reciprocated.  However, unfortunately, after

beginning a physical relationship with this student, Mr. Carter discovered that this student had

human immunodeficiency virus (HIV), and subsequently learned that the student had infected

him with the disease.  At this time HIV is an incurable disease, and can progress to acquired

immune deficiency syndrome (AIDS) which is ultimately fatal. This diagnosis completely

upended Mr. Carter's life.  One of the many ways that his life had been upended was that Mr.

Carter, who had been an athlete in high school,  had been planning and training with the

University football team with the intention to walk on to the team.  However, once  he was

diagnosed with HIV, the University doctor told him that could not join the team.

19.     After learning that he had been infected with HIV by his romantic partner, Mr.

Carter and the student became involved in several raucous arguments in the CMRC.  Mr. Carter

went to Dr. Travis and told him what was happening—letting him know the truth about the

relationship between him and the other student, and informing him that they were not just

friends, but that they were intimate partners in a romantic relationship.    Dr. Travis told Mr.

Carter that he and the student had to go to University counseling.  Mr. Carter went, but the other

student did not.

20.     Mr. Carter shared his CMRC living space with 3 male roommates.  Each male had

a separate private bedroom, but the 4 of them shared common spaces such as a kitchen, living

and dining room.  On or about September , 2017, when Mr. Carter returned to his room at the

CMRC after being in class for more than 3 hours, he discovered that the Campus Police had

raided their living space due to a complaint that people were smoking marijuana there.  Upon

information and belief, Campus Police found 2-6 people in his roommates' rooms smoking

marijuana.  Campus Police then searched the living space, including the bedrooms, and found a

quantity of marijuana in the bedrooms of the other roommates.  Upon information and belief, the

only thing Campus Police stated that they discovered in Mr. Carter's room was a miniscule

amount of crumbled parts of dry leaves—much less than any amounts of any substances that

were found in the rooms of the other roommates.  It is not clear whether this substance was

measured, weighed or tested, however, Campus Police alleged that it was marijuana, which apparently was alleged to be a prohibited substance on campus. Mr. Carter was not involved in the marijuana smoking, he was not found or alleged to have been smoking marijuana, there was no marijuana smoking occurring in his room and he was not even in the CMRC when the other people were found smoking marijuana in the living space.

21.     Upon information and belief, Dr. Travis gave the order to have Mr. Carter immediately put out of and removed from the CMRC.  Mr. Carter was removed and made to leave immediately, and not even allowed to get his HIV medicine, causing him tremendous mental, physical and emotional distress.  Mr. Carter had no where to go, and was homeless again.  He was subsequently admitted to the psychiatric ward of a local hospital.  After being released, he was again without a place to stay.

22.     Mr. Carter was also suspended from school as a result of this incident.   He remained suspended while he pursued the University appellate process.  Appealing and contesting the decision to suspend him from school and expel him from student housing  is constitutionally protected behavior.

23.     Upon information and belief, none of the other roommates were put out of the CMRC, immediately or ever, as a result of this incident.  None of the other people involved in actually smoking the marijuana were put out of their student housing.  None of the other roommates or other students involved were suspended from school as a result of this incident.

24.     Mr. Carter was the only student who lived in this CMRC room who was known to be homosexual.  He was the only student who had HIV.  He was also the only student who was put out of the CMRC as a result of this incident.  Upon information and belief he is the only student who has been put out of University Housing without even having the opportunity to

gather important belongings such as life-saving medicine.  He was the only student who was suspended as a result of this incident.

25.     Mr. Carter was immediately put out of Student Housing with no process, much less due process, and subsequently suspended from school.  The University treated him this way because he is a Black, Gay male with HIV.  None of the other students who were not known to BSU to be  Black Gay males with HIV were treated in this way, and it is discrimination in violation of federal law, common law, and the laws of the State of Maryland.

26.     BSU was aware that Mr. Carter is a Black male who is Gay and HIV positive. Dr. Travis was aware that Mr. Carter was a Black male who is Gay and HIV positive.  Mr. Carter had confided his situation to Dr. Travis and Dr. Travis' administrative assistant, Ann Valentine, and any knowledge of Ann Valentine can be imputed and implied to be known and was actually known to Dr. Travis. Ms. Valentine relayed the details about Mr. Carter's situation that she knew to Dr. Travis.  The Campus Doctor and Campus counselor also were aware that Mr. Carter is a Black male who is Gay and HIV positive. Other employees and officials at BSU were aware that Mr. Carter is a Black male who is Gay and HIV positive.  The knowledge and awareness about Mr. Carter's sexual orientation and disability status of Dr. Travis and his assistant Ann Valentine and the other doctors, counselors and other BSU employees and officials can be imputed to all Defendants as a result of their actual knowledge and their relationship with each other, including the doctrine of Respondeat Superior.

27.     As Vice President for Student Affairs, Dr. Travis was aware of and connected with the Office of Equity Compliance, BSU's mechanism for investigating and otherwise addressing violations of federal and state law with regard to discrimination in any form, including race, sex, sexual orientation and disability.  Mr. Carter came to Dr. Travis on numerous

occasions with regard to the problems he was experiencing as a Gay male.  While Dr. Travis

referred Mr. Carter to counseling, he never referred Mr. Carter to the Office of Equity

Compliance, nor initiated a Title 9, Title 7, or Americans with Disabilities Act complaint on his

behalf or advised him that this remedy was available.  Dr. Travis had a conflict of interest in this

matter because he was the person who should have referred Mr. Carter to the Office of Equity

Compliance and or initiated and or supervised an investigation into his treatment in this situation;

yet he was also the person who  gave the order to expel Mr. Carter from Student Housing and

suspend him from school without due process and in violation of his rights under state, federal

and common law.

28.     Mr. Carter did not prevail in the University appellate process, and while he was

subsequently allowed to return to school, he was not allowed to return to the CMRC or any other

campus housing.

29.     Mr. Carter never recovered from the stress of the discrimination he experienced

from BSU and the violations of his rights under state, federal and common law.  When he was

finally allowed to return to school, his grades plummeted, and he was never able to turn it

around.  These violations caused Mr. Carter to experience humiliation, emotional distress, tuition

costs, interest on student loans, lost wages and other damages.

30.     Mr. Carter asked BSU for documentation with regard to his suspension from

school and expulsion from Student housing.  BSU officials told him that they would not give him

any documents without a request from a lawyer.

## CLAIMS

### COUNT 1

**(Discrimination based on Sex and Sexual Orientation in Violation of Title IX of the
Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq.,)**

31.     The allegations and averments of fact contained in the previous paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

32.     Plaintiff asserts this claim against all Defendants.

33.     Under Title IX of the Education Amendments of 1972, Defendants are prohibited from discriminating against Mr. Carter on the basis of sex and sexual orientation.  20 U.S.C. §§ 1681 et seq.

34.     Defendants discriminated against Mr. Carter on the basis of sex and sexual orientation.

35.     Defendants discriminated against Mr. Carter by treating him differently than they would have treated a similarly situated female.  If he had been a female who was experiencing a difficult time as a result of a bad relationship, he would have received more support and not have been expelled from campus housing and suspended from college during a period of obvious mental and emotional turmoil as a result of the effects of the bad relationship.

36.     Defendants discriminated against Mr. Carter on the basis of his sexual orientation by treating him differently than they would have treated a heterosexual student.  If he had been a straight student—male or female—who was experiencing a difficult time as a result of a bad heterosexual relationship, he would have received more support and not have been expelled from campus housing and suspended from college during a period of obvious mental and emotional turmoil as a result of the effects of the bad relationship.

37.     Because of Dr. Travis' conflicts of interest, he did not refer Mr. Carter to the Office of Equity Compliance or cause an investigation to be initiated to determine whether Mr. Carter was experiencing discrimination on the basis of his sex or sexual orientation.

38.     As shown in the preceding paragraphs, Defendants' conduct was intentional, willful, and taken in disregard of Mr. Carter's federally-protected rights.

39.     That as a result of the Defendants' conduct Mr. Carter suffered damages including but not limited to emotional trauma, humiliation, distress, tuition costs, lost wages and other damages.

WHEREFORE, Mr. Carter, demands judgment in an amount which exceeds Seventy Five Thousand Dollars and 00/100 ($75,000), plus interest, declaratory relief, statutory damages, compensatory damages, treble damages, costs and attorney fees against the Defendants jointly and severally.

## COUNT 2

### (Discrimination based on Disability in
### Violation of the Americans with Disabilities Act 42 U.S.C § 12101, et seq.)

40.     The allegations and averments of facts contained in all preceding paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

41.     Plaintiff asserts this claim against all Defendants.

42.     The Defendants, individually and /or through their agents, servants and employees did discriminate against Mr. Carter based on his disability  as prohibited by the Americans with Disabilities Act (ADA)  42 U.S.C § 12101, et seq.

43.     Mr. Carter has HIV, a physical impairment that substantially limits one or more of his major life activities. Defendants either directly or implicitly knew and were aware of this disability.

44.     Mr. Carter was able to safely live in Student Housing with reasonable accommodation for his physical disability and medical condition. At all times during his stay in Student Housing, he did not do anything or engage in any behaviors that were different than

other students at BSU. BSU expelled Mr. Carter from Student Housing and suspended him from school, not even allowing him to get his life-saving medication and ensuring that he would become immediately homeless. Other similarly situated students who did not have HIV or who were not known to have HIV were not treated this way. Defendants treated Mr. Carter this way because of his sexual orientation and his disability.

45.     Defendants discriminated against Mr. Carter by treating him differently than they treated similarly situated male students without HIV, and or other students who were not known to have HIV.  Defendants failed to accommodate his condition and engage in an interactive process to determine how to accommodate his condition.

46.     Defendants did not grant Mr. Carter's request for reinstatement into Student Housing because of his disability, and his status as a Black Gay male with HIV.

47.     Because of Dr. Travis' conflicts of interest, he did not refer Mr. Carter to the Office of Equity Compliance or cause an investigation to be initiated to determine whether Mr. Carter was experiencing discrimination on the basis of his disability.

48.     As shown in the preceding paragraphs, Defendants' conduct was intentional, willful, and taken with the intent to injure Mr. Carter and in disregard of Mr. Carter's protected rights.

49.     As a result of the Defendants' Conduct Mr. Carter suffered damages including emotional trauma, humiliation, distress, tuition costs, lost wages and other damages.

WHEREFORE, Mr. Carter, demands judgment in an amount which exceeds Seventy Five Thousand Dollars and 00/100 ($75,000), plus interest, declaratory relief, statutory damages, compensatory damages, costs and attorney fees and any other damages and compensation as available by law against the Defendants jointly and severally.

## COUNT 3

### (Breach Of Contract – All Defendants)

49.　　The allegations and averments of facts contained in all preceding paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

50.　　The actions of the Defendants as described above constitute a breach of an agreement ("the Agreement").

51.　　Defendants agreed to provide educational services and student housing to Mr. Carter, in accordance with their policies, in exchange for a fee in the form of tuition and payment for such.

52.　　Mr. Carter obtained student loans and paid for his tuition, fees  and housing payments and or made arrangements to pay as directed;

53.　　However, as described above, Defendants breached the Agreement and failed to provide educational services and student housing to Mr. Carter in accordance with their policies and the Agreement, and improperly expelled him from Student Housing and suspended him from school.

54.　　Defendants did not follow their own procedures as required with respect to Mr. Carter's investigation, disciplinary and appeal processes, including but not limited to access to disciplinary records.

55.　　Defendants punished Mr. Carter for being a Gay male with HIV even though his being so is not under his control, and such punishment is prohibited by Defendants' own code of conduct and Defendants have promised not to discriminate on the basis of sexual orientation and or disability.

56.     Defendants punished Mr. Carter more harshly than they punished students who were not Gay men and or students who did not have HIV.

57.     Defendants denied Mr. Carter the opportunity to continue attending classes and living in Student Housing during his appeal process.

58.     These breaches have proximately caused damage to Mr. Carter such that he is entitled to compensatory damages in the amount of at least $75,000, and other damages according to proof at trial.

## COUNT 4

**(Breach of the Covenant of Good Faith and Fair Dealing – All Defendants)**

59.     The allegations and averments of facts contained in all preceding paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

60.     Certain portions of  BSU and the University System of Maryland's policies regarding Housing, Conduct, Discipline and Student Affairs purport to grant discretion to administrators in implementing such policies.

61.     Defendants abused that discretion, exercised it arbitrarily and in bad faith by depriving Mr. Carter of fair procedures, fair disciplinary action and by ultimately expelling him from Student Housing and suspending him from school for being a Gay male with HIV, even though being so is not prohibited by BSU and the University System of Maryland's code of conduct policies.

62.     Mr. Carter did not expect that BSU would expel him from Student Housing and suspend him from school for being a Gay male with HIV.  Mr. Carter's expectations were reasonable as BSU and University System of Maryland's policies did not prohibit matriculation and housing for students with HIV who were Gay males, BSU and the University System of

Maryland emphasized the value of diversity and  BSU and the University System of Maryland sanctions LGBTQ student groups.

63.     Mr. Carter did not expect that BSU would expel him from Student Housing and suspend him from school for being unfortunate enough to have roommates who smoked and possessed marijuana in their living quarters, when he did not participate in any of those activities and was not even in the living quarters when it happened, and the roommates themselves did not even get expelled from Student Housing or suspended from school.

64.      These breaches have proximately caused damage to Mr. Carter such that he is entitled to compensatory damages in the amount of at least $75, 000, and other damages according to proof at trial.

## COUNT 5

### (Negligence – All Defendants)

65.     The allegations and averments of facts contained in all preceding paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

66.     The Defendants individually and/or through their agents, servants and/or employees had a duty to use reasonable care not to harm Mr. Carter or to violate his rights.

67.     This duty was breached.  The breaches included, but are not limited to, the following:

    a.  Immediately expelling him from Student Housing with no opportunity to gather his life-saving medication;

    b.  Improperly investigating the alleged marijuana incident;

    c.  Improperly failing to advise him of the availability of seeking an investigation with the BSU Office of Equity Compliance;

d.  Improperly failing to refer his situation to the BSU Office of Equity Compliance, especially when the Vice President for Student Affairs, who is familiar with and connected to the Office of Equity Compliance is the person who was aware of his situation and did not initiate investigation or refer his situation for investigation ;

e.  Failure to properly train its employees, including Dr. Travis, as to how to properly, fairly and sensitively deal with students who are Gay males with HIV;

f.  Further breaches to be identified through discovery.

68.     As a result of the Defendants' conduct as set forth above, Mr. Carter has suffered and will continue to suffer severe mental anguish, emotional distress, medical and other related expenses and a loss of income.

WHEREFORE,  Mr. Carter seeks compensatory damages in an amount which exceeds Seventy Five Thousand Dollars and 00/100 ($75,000), plus other damages including interest, costs and attorney fees against the Defendants jointly and severally.

## COUNT 6

**(Violations of Maryland Declaration of Rights/State Constitutional Claim – All Defendants)**

69.      The allegations and averments of fact contained in all preceding paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

70.     This is, in part, an action to redress the deprivation under color of statute, ordinance, regulation, custom or usage of a right, privilege and immunity that are secured to the Plaintiff by the Declaration of Rights of the Constitution of the State of Maryland, including but not limited to Articles 2, 19, 24 and 26, and arising under the law and statutes of the State of Maryland.

71.     During all times mentioned herein, Defendants engaged in the illegal conduct herein mentioned, to the injury of Mr. Carter and deprived him of his then existing and clearly established rights, privileges and immunities secured to him by Declaration of Rights of the Constitution of the State of Maryland, including but not limited to Articles 2, 19, 24 and 26, and arising under the laws and statutes of the State of Maryland.

72.     All Defendants have subjected Mr. Carter to conduct consisting of violations of his rights to housing and public accommodations which may, upon further information, constitute a pattern and practice by the Defendants, in denial of the rights, privileges and immunities guaranteed to Mr. Carter by the Constitution of the State of Maryland.

73.     The acts alleged herein violated clearly established constitution and statutory rights of Mr. Carter, were not objectively reasonable, and were done under circumstances in which no reasonable school official, employee or administrator would fail to realize that his or her conduct was a violation of Mr. Carter's rights.

74.     Defendants and their agents, servants and/or employees acted improperly and/or acted willfully, knowingly and purposefully with specific intent, to deprive Mr. Carter of his rights, privileges and immunities secured to him by the Laws and Constitution of the State of Maryland, including but not limited to the following:  Freedom from discrimination based on sexual orientation and disability regarding education, housing, and public accommodations; the right to due process; the right to life, the right to liberty; and freedom from unreasonable searches and seizures.  All of these rights are secured to Mr. Carter by the provisions of the Declaration of Rights of the Constitution of the State of Maryland.

75.     Alternatively, the acts alleged herein were intentionally performed with malice, without legal justification or excuse, but with an evil or rancorous motive influenced by the intent to discriminate, the purpose and result being to deliberately and willfully injure Mr. Carter.

76.     As a result of the Defendants' conduct as set forth above, Mr. Carter has suffered and will continue to suffer severe anguish, emotional distress, medical and other related expenses and a loss of income.

WHEREFORE, Mr. Carter, seeks compensatory damages in an amount which exceeds Seventy Five Thousand Dollars and 00/100 ($75,000), plus other damages, interest, costs and attorney fees against the Defendants jointly and severally.

## **COUNT 7**

### **(Vicarious Liability – All Defendants)**

77.      The allegations and averments of fact contained in all preceding paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

78.     In addition to their own individual liability described above and at all times pertinent to the subject matter of this case, Defendants Dr. Travis, President Hawkins Breaux, Chancellor Caret and any other BSU or USM employees or officials involved with Mr. Carter's situation were also the agents, servants and/or employees of Defendants State of Maryland, Bowie State University and the University System of Maryland.

79.     At all times pertinent herein, Defendants Dr. Travis, President Hawkins Breaux, Chancellor Caret and any other BSU or USM employee or official involved with Mr. Carter's situation were acting in concert with, for and on behalf of, at the insistence, request and instruction of Defendants State of Maryland and or Bowie State University and the University

System of Maryland; and were otherwise acting within the scope of their responsibility, authority and employment as agent, servant and/or employee of said Defendants.

80.     Defendants are vicariously liable for the acts of the employees and officials who were acting in the cause of and within the scope of their responsibility, authority and employment as agents, servants and/or employees of Defendants State of Maryland and Bowie State University and the University System of Maryland at all times pertinent herein.

81.     As a result of the Defendants' conduct as set forth above, Mr. Carter has suffered and will continue to suffer severe mental anguish, emotional distress, medical and other related expenses and a loss of income.

WHEREFORE, Mr. Carter, seeks compensatory damages in an amount which exceeds Seventy Five Thousand Dollars and 00/100 ($75,000), plus other damages, interest, costs and attorney fees against the Defendants jointly and severally.

## **COUNT 8**

**(Intentional Infliction of Emotional Distress – Defendants BSU and  Dr. Travis)**

82.      The allegations and averments of fact contained in all preceding paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

83.     As described above, Dr. Travis' conduct was intentional and outrageous for the following reasons:

84.     BSU and USM  do not prohibit attendance, student housing residence, and matriculation by students who are Gay and or HIV positive. BSU and USM purport not to discriminate on the basis of sexual orientation.

85.     However, by treating him differently than other students who were not Gay and or HIV positive, and putting him out of the Student Housing immediately without the opportunity

19

to gather his life-saving medication and ensuring that he would be again homeless, knowing full well the prior associations, triggers and struggles with homelessness that Mr. Carter had endured in his young life, Dr. Travis was actively and intentionally and with full knowledge of the fact that Mr. Carter was Gay and HIV positive, engaging in actions that were meant to and did in fact cause damage, pain and suffering, and emotional distress to Mr. Carter.

86.　　　Dr. Travis' actions in this regard were insensitive, not morally right, not legally required, and in contravention to the stated goals and policies of BSU and USM.

87.　　　BSU compounded the violation of Mr. Carter's rights when they refused to give him his disciplinary records and other information so that he could attempt to assert and protect his rights.

88.　　　Defendants' BSU and Dr. Travis' conduct caused Mr. Carter to experience humiliation, emotional distress and other damages in an amount over $75,000 to be determined at trial.

## **COUNT 9**

### **(Fradulent Misrepresentation  - BSU and USM)**

89.　　　The allegations and averments of fact contained in all preceding paragraphs are hereby adopted and incorporated by reference as though stated in full herein.

90.　　　BSU and USM have misrepresented their non-discrimination, Title IX, Student Conduct, Disciplinary, and other policies and procedures.

91.　　　BSU and USM represented that they would not discriminate against students based on sexual orientation and or disability status.

92.　　　Bowie State University's website states as follows (in pertinent part):

　　　Bowie State University shall not discriminate against any
　　　individual on the basis of race, color, religion, age, ancestry or

20

national origin, sex, **sexual orientation**, **disability**, marital status or veteran status. All policies, programs, and activities of Bowie State University are and shall be in conformity with all pertinent Federal and state laws of nondiscrimination including, but not limited to: Title VII of the Civil Rights Act of 1964, as amended, **Title IX of the Education Amendments of 1972**, the Equal Pay Act of 1963, the Age Discrimination Act, Sections 503 and 504 of the Rehabilitation Act of 1973, **the Americans with Disabilities Act of 1990**, Federal Executive Order No. 11375, and Article 49B of the Annotated Code of Maryland. This commitment applies in all areas and embraces faculty, staff, and students. [emphasis added]

https://bowiestate.edu/about/administration-and-governance/division-of-administration-and-finance/human-resources/eeo-non-discrimination-statement.php

93.     USM's website states as follows (in pertinent part):

PROHIBITION AGAINST DISCRIMINATION
All policies, programs, and activities of the USM are and shall be in conformity with all pertinent federal and State laws concerning non-discrimination on the basis of race, color, religion, age, national origin, sex, disability, **sexual orientation**, gender identity, gender expression, marital status, genetic information, veteran's status, and any other legally-protected characteristic.
This policy prohibits discrimination against **students**, faculty, staff, and applicants for admission or employment, on the basis of any legally-protected characteristic, in admissions, financial aid, educational services, **housing**, student programs and activities, recruitment, hiring, employment, appointment, promotion, tenure, demotion, transfer, layoff or termination, compensation, selection for training and professional development, and employee services. This policy prohibits harassment, including acts of violence, on the basis of any legally-protected characteristic, at USM institutions and in connection with USM programs and activities. This policy also prohibits retaliation against any student, faculty, staff, or applicant for admission or employment who asserts a claim of discrimination under this policy or one who participates in an investigation of a complaint of discrimination.

https://www.usmd.edu/regents/bylaws/SectionVI/VI100.pdf

94.     These representations were false because BSU  expelled Mr. Carter from Student Housing and suspended him from school and otherwise treated him differently from students who were not Black Gay male students with HIV.   BSU acted with harshness, fear and rejection when they treated Mr. Carter like an outcast by expelling him immediately without allowing him to gather his life-saving medication and sending him into homelessness.

95.     BSU's actions caused instability in Mr. Carter's life, including but not limited to causing him to be homeless, to be without his life-saving medication, to be committed to the psychiatric ward of a local hospital and to suffer other damages.

96.     BSU could have allowed Mr. Carter to continue to live in Student Housing and remain enrolled in school while his case was being investigated; and at the very least, could have allowed him to gather his life-saving medication before being thrust out onto the street, but they did not.

97.     BSU and USM's policies indicated that they value diversity and inclusion and that Gay students and students with disabilities would be safe, protected and allowed to contribute to the diversity at their institutions.

98.     Their representations were false because they punished Mr. Carter harshly and expelled him from Student Housing, did not allow him to gather his life-saving medicine and suspended him from school, rather than treating him with kindness and sensitivity.

99.     BSU and USM committed the misrepresentations described above with knowledge of their falsity as applied to students who were Gay males with HIV.

100.    BSU and USM intended for Mr. Carter to rely on its representations to induce him to attend BSU and to pay tuition to BSU.   Mr. Carter relied on the representations to his detriment, and was justified in relying on their representations because they were made to him as

part of the application and enrollment process, and he was not aware that the representations were false.

101.     Mr. Carter was harmed by the false representations because their falsity caused him to be unfairly expelled from Student Housing, go without his life-saving medication, be suspended from school and be denied due process of law.  He was further delayed in his career and education and experienced humiliation, emotional distress and other damages in excess of $75,000 as will be described at trial.

## COUNT 10

### (Retaliation – All Defendants )

102.     The allegations contained in the preceding paragraphs are hereby incorporated by reference as though stated in full herein.

103.     Title IX and the ADA as well as federal and state law forbid retaliation while a complainant pursues and engages in protected behavior in an attempt to establish and protect his rights under these laws.

104.     BSU has a non-retaliation clause on its website that reads as follows (in pertinent part):

> [E]mployees and applicants will not be subjected to harassment, intimidation, threats, coercion, or discrimination because they have engaged in, or may have engaged in, activities such as filing a complaint, assisting or participating in an investigation, compliance review or hearing, or opposing any act or practice made unlawful, or exercising any other right protected by Section 503 of the Rehabilitation Act of 1973, as amended or the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended.

https://bowiestate.edu/about/administration-and-governance/division-of-administration-and-finance/human-resources/eeo-non-discrimination-statement.php

105.    USM has a non-retaliation clause on its website that reads as follows (in pertinent part):

> This policy prohibits harassment, including acts of violence, on the basis of any legally-protected characteristic, at USM institutions and in connection with USM programs and activities. This policy also prohibits retaliation against any student, faculty, staff, or applicant for admission or employment who asserts a claim of discrimination under this policy or one who participates in an investigation of a complaint of discrimination.

https://www.usmd.edu/regents/bylaws/SectionVI/VI100.pdf

106.    Notwithstanding these prohibitions against retaliation, BSU retaliated against Mr. Carter for exercising his rights to pursue and appeal the summary expulsion by not allowing him to come back to Student Housing or enroll in school during the investigation of his situation and the University Appellate Process, and not allowing him to return to Student Housing after the investigation of the situation and the University Appellate Process was completed.

**Relief**

**WHEREFORE,** the Plaintiff demands judgment against the Defendants jointly and severally as follows:

1.  A Declaration that the Defendants violated Title IX and the ADA and other appropriate Declaratory Relief;

2.  Compensatory Damages  that exceed Seventy Five Thousand Dollars and 00/100 ($75,000);

3.  Punitive Damages;

4.  Statutory damages;

5.  General Damages;

6.  Treble damages;

7.  All other damages as allowed or required by statute or law;

8.  Costs and Interest;

9.  Attorney's Fees, expenses and costs;

10.  Such other relief as the Court deems just and proper.

**Demand for Jury Trial**

Plaintiff hereby makes a demand for trial by jury in this matter.

Respectfully Submitted,

__/s/_____
Wanda J. Dixon, Esq.
Attorney for Plaintiff Carter
The Dixon Law Firm, LLC
1401 Mercantile Lane, Suite 381
Largo, MD   20774
MD District Court Bar number 18386
wdixon@thedixonlawfirm.law
301-456-5156